Good morning. May it please the court, Greg May. Wait a minute, I don't think my camera's on. Can you see me? We can see you. There it is. Greg May, representing appellant Elena Livenson. Just one bit of housekeeping in your honor. Going through the brief with the yesterday. Again, I noticed two more errata in the opening brief. They are important record references and it looks like the court will let me make that record. Well, counsel, you can, but we prefer you to get to your argument. Okay. The first part of the reply brief addresses the appellee's argument that certain arguments raised in the opening brief have been waived by a failure to raise them below. And the only thing I want to add to that argument is that the case of Smith versus Arthur Anderson, which we cite solely for the proposition at this point that a party may make an argument on an ultimate issue with additional facts from the record, is actually more valuable than that to our position. It also, one of the reasons that the court allowed the argument to go forward and deemed it not waived, is that it was a somewhat complicated procedure where there were a number of hearings on different settlements and the settling defendants didn't challenge the standing of the non-settling defendants until the Court of Appeals said, we can't blame the party for not making the argument below because the other party didn't challenge their standing until they were halfway through the settlements. So that's very similar to what happened here in the beginning of our reply brief where we argue that plaintiff's counsel was understandably misled about the defendant's intent to file a motion for summary judgment and therefore closed her office for the three-day weekend and didn't see a didn't see the motion filed late Friday night until Tuesday morning giving her less than half the normal time to respond. So that's the only thing I want to add to the argument on waiver. But I realize it's a threshold issue so before I go on to the merits, does the court have any questions on that threshold issue? No, thank you. I'd like to start the merits by just emphasizing what the burdens of the relative of the parties, relative burdens of the parties are at this point. First off, the McDonnell-Douglas analysis puts a very heavy burden on the moving party, the moving defendant in summary judgment and a correspondingly light burden on the plaintiff. Yeah, we know that. Help us with the narrative here because as I read the narrative here, your client was a successful employee. She worked for this company I think all told almost 20 years. She apparently has had difficulties with migraine headaches and this has been going on I guess for some time. She told Patel, who later became her migraines. But that seems not to have really seriously impeded her work in the earlier part of her career. Tell me about the disabilities that she has suffered that the company has refused to accommodate. What are those disabilities and what should the company have done and why is the company wrong to say, listen, we terminated her because of all these other reasons? Sure, well you're right. She had a good record. She didn't have a perfect record. The abilities go through a lot of counseling they did in the last few years leading up to her termination. But she did have a good record and her migraines didn't really affect her work until the last few years because she had this flex time schedule, which she testified was granted partly as an all over the world in the time zone. Differences made it handy to have that schedule. She made her migraines, it wasn't just migraines, she had migraines, she had a severe anxiety and that manifested itself in heart palpitations and an inability to handle stress. In fact when she went on. But the severe anxiety, heart palpitations or racing heart and the difficulty of managing stress, that starts to show up when she's in trouble at work and they're beginning to threaten and then they do the so-called PRP. Well, that's the effect of the PRP, but the underlying disability is already there. She's not claiming a disability from having a hard time working with certain supervisors. Claiming that she had a pre-existing disability that is aggravated by the way they did things, both in the PRP and in scheduling the scrum meetings and so forth. So I just want to make clear, she's not claiming that she's got a disability because she can't work well with Patel and Norman, her supervisor and the resources person that monitored her PRPs. Counsel, to go back to where we are in terms of the burdens here, the district court assumed that you made a prima facie case out of disability discrimination and then it found that there was a legitimate non-discriminatory reason for her termination on behalf of aeronautical radio and then the burden goes back to you to show that that reason that they gave, which was non-performance or failing to meet goals in the PHP, was pretext. So what's your best argument that that reason that they gave was pretext? Well, we can prove pretext either directly by evidence of a discriminatory animus or the purported legitimate reason is actually lacking in credibility and we did both in the opening brief. Ages 27 through 30 of the opening brief, we detailed very well what kind of notice that the plaintiff gave to the defendant and what actions the defendant took in return. In every iteration of the were related to her disability. She made more disclosures as time went on and they kept criticizing her for not being able not attending meetings and for her reactions to the PRP. On the indirect side, the argument is that there's evidence to suggest that Patel knew one of the accusations she made in the PRP was false. Now, I understand the law says that a mistake, the employer doesn't have to be perfect. If the employer makes an honestly held mistake, there can't be liability. But here the implication is that Patel wasn't making an honest mistake, that she knew that one of her accusations was false and we detailed that in the brief. And which accusation was that? It was about the plaintiff not moving on to a new project and telling the supervisor of that project that she still had work to do on another project and she was going to stick with that because the supervisor didn't need somebody of her that was false. Patel criticized her for that, for refusing the directive to work on the new project. But the evidence that that was false is an email that from Patel to the plaintiff that said stick on this project or words to that effect. So, a jury could reasonably conclude that when a supervisor makes an accusation, it's disproven by that supervisor's own communication that it wasn't an innocent error. But the record has got a lot of things in here where your client is refusing to attend meetings, she's leaving meetings, she's refusing to accept assigned work because it's below her. I mean, there's a lot of stuff in here that an employer, I think, doesn't have to put up with. And you're saying that the employer is relying on those things as protectual, as supportive of the termination? Well, yeah, in addition to what I just explained, the plaintiff was set up to fail. The appellees make a point of saying that plaintiff only cites one mere site to the record for being set up to fail. That one site packs a lot of wallet. Well, you know, as I look at this as kind of a, I'm now talking non-law, but just as a narrative, this really looks like it was promoted to a position that she wasn't going to be very good at. Because once she's promoted, there's different expectations on her, and it's at that point that she has trouble satisfying what her boss wants. Well, what matters, I guess, is whether that's innocent or not. The defendant knew that it's hard to accuse an employer of bias when the charge is that the employer promoted her. But if she's promoted into a position that she can't fulfill, that's being set up to fail. And she pointed out in her response to the February 6 PRP that Hazel, that's Patel, has a very different way of development than she had been doing for the last 20 years. She doesn't see how she can be successful that way. That Patel never gave her any training in her way of doing things. And that Patel complained that she wasn't mentoring people on Patel's way of doing things, even though the plaintiff herself wasn't sure how to do it. Could they have accommodated her disabilities by demoting her back to the I think as to the flex time schedule, was there any evidence that Patel and or Dorman thought that they were giving her flex time as an accommodation to disabilities? It seems as though she sort of hid her disabilities, right? Yes, the evidence is in the plaintiff's own declaration, which there's no reason to discount. It's not inconsistent with any prior deposition testimony where the plaintiff says that it was that her flex time was at least in part an accommodation for her disabilities. Just on the being set up to fail, these things that I just read to you that the plaintiff put forth in her response to the February 6 PRP, it's really no more subjective. The appellee would say it's just a subjective analysis of her own work performance. It's no more subjective than the plaintiff in Swanson, who was a teacher who had a long track record of success. And after notice of her disability, got moved to a different grade. She has to be sent back to her or her other grade, which was a second grade. She got changed to kindergarten. She said she didn't get the resources that she needed to succeed in that position. That's not any firmer than what we've got in this case. So I think she's established being set up to fail. Why would that what motive would they have to do that? If, if they have a discriminatory motive, they would want you say if they but what and why would employers promote an employee with the notion that she would fail in the position to which the employee was being promoted? Well, I think she was. I'm sorry, your honor. Do you need to finish? Yeah. Yes. Okay. I think the promotion was several years before her termination. So it's not like it was an immediate thing. Let's promote her and then fire. Like I said, the appellees do set forth some complaints they had about her performance in the new position. But the case law says that if you're being set up to fail, that is evidence of pretext. That may be what it says. I'm just asking you as a practical matter why an employer would do it. Particularly in this particular case where well, again, the determination followed the promotion by several years. So it wasn't. It's not as nonsensical as it sounds. Excuse me. It's not like the employer immediately fired her after promoting her. It's it's considered evidence of pretext, because to all appearances to a finder of fact, it could look like you were deliberately trying to get her to fail. So they would have an excuse for firing her. I think that's the whole concept behind the being set up to fail argument. Yeah, you I asked the question you gave whatever answer you thought you want to do. That's it. All right. Well, I don't know why is so they have an excuse to fire her. That's as I understand your question be why they would do that. But I promoted her because they wanted an excuse to fire her after she's been satisfactorily performing her work there for 20 years. No, they the decision to fire her didn't come for several years after she was promoted. I think that's sort of inconsistent with your whole argument that they promoted her to fire her. But I don't want to I don't want to argue with you. Go ahead. Well, Council, you're over time. So why don't we hear from the opposing council. Ms. Selden. Good morning, Your Honors. Karen Selden on behalf of the defendant, Eric Incorporated. The court should affirm summary judgment because no reasonable jury could find that the company discharged plaintiff due to any disability or that it failed to reasonably accommodate her. I'll start with the discrimination claim. Plaintiff doesn't challenge that the company had a legitimate non-discriminatory reason for terminating her, which was a consistent and well-documented record of performance issues dating back to 2016 and 2017, well before she made any formal request for accommodation. And in fact, in April of 2017, her supervisor, Ms. Patel, told her in writing that if her performance did not improve, she would be put on a performance recovery plan. And that's in the record at page 568. But plaintiff's performance issues continued after April and, in fact, got worse when she was transferred to this platform project in late 2017. And it was an assignment that she didn't like because, as Your Honors pointed out, it was a different kind of assignment for her. It took her out of her comfort zone and she pushed back against the assignment, refused to prioritize deadlines and didn't show up for meetings. And so the company followed through and put her on the performance recovery plan, or PRP, at the beginning of 2018. Her performance issues continued, and so that was a reason that she was terminated. Now, plaintiff says, ignore all of that and accept that she was fired for a disability. But the only argument she made below was temporal proximity. She admits that that was the only argument that was preserved. And as the district court found, and plaintiff doesn't dispute on appeal, timing alone doesn't establish a tribal issue with respect to pretext as a matter of law. And the cases on that are uniform. And so the only basis that's been preserved for appeal fails as a matter of law and the court doesn't need to go any further. You can affirm the order on that basis alone. Now, if you are to consider the arguments that plaintiff just made, none of them were in the briefing below. The panel should deem them waived. And they haven't offered a sound reason why you should consider them. Plaintiff's counsel said that, well, we didn't have a lot of time to respond to the summary judgment motion. That wasn't addressed in the opening brief. And so that argument is waived. It's waiver upon waiver. Well, let's address the arguments, assuming we're not going to hold them to waiver. Just let's just... Certainly, Your Honor. So with respect to pretext, one of the arguments that you heard was that they have direct evidence of discrimination because the company criticized her reactions to the PRP. And that argument veils for three reasons. First, there is no evidence in the record that Ms. Patel or Ms. Dorman, the HR supervisor, had any knowledge that her rude behavior, the way she was talking over Ms. Patel, walking out of meetings. They had no knowledge that that had anything to do with a disability. It's not in any of the extensive writings that plaintiffs submitted to them during her employment. And in fact, she said quite the opposite. She denied that she was behaving unprofessionally at all. And for that, I would direct the panel to a few different emails that she sent. One's at page 369 of the record. It's an email to Ms. Dorman sent after the 30-day PRP review where she'd been coached on her rude behavior. And she says, and I quote, there is nothing for me to improve, close quote. And then she goes on to try and shift the blame to Ms. Patel, saying, Hazel is not a good manager and that she's not the only one at all who has issues with her. And then I'd also direct the panel to her written response to the PRP. That's at page 633, in which she's answering Ms. Dorman's critique about how she's behaving in a PRP meetings by talking over Ms. Dorman's kind of disability. She simply says, a leader gets respect by his or her acts. And then just a third example for the court. There's an instance where Ms. Patel coaches her about using an incorrect tone with a coworker in an email. And that's at the record at 163. And her response is, apparently you did not read my email carefully. My email is technically professional. So here is plaintiff defiantly telling Patel and Dorman over and over again that there's nothing wrong with my behavior. I'm being perfectly professional, which is the opposite of telling the company, I have a disability and I need help. And the way I'm reacting is a result of that disability. So no knowledge. The second reason why the argument fails is that there isn't any competent evidence in the record that these so-called stress reactions were a disability symptom. There's no doctor's note to that effect. There's no expert report. And all we have is this after-the-fact declaration from the plaintiff, in which she says in very vague terms that the PRP would, quote, cause my disability to flare up. And that's at 288 and 289. But she doesn't specify what disability is flaring up. What does the flare up look like? There's certainly nothing to suggest that her misconduct and her walking out of meetings and her being disrespectful has anything to do with that. And the third point, and it's something that the panel alluded to, simply being stressed out by performance management, ordinary performance management, and being held to performance expectations is not a disability that's recognized in the FEHA. And that's directly addressed in the Higgins case in our brief at page 44 and the Stripling case, which is an unpublished panel decision. But they're clear that because you're stressed out from performance management doesn't make you a disabled person entitled to accommodation. Now, I'm not sure the argument is made in this form, but is having a difficult personality itself a disability? Or, I'll say it in a different way, and to some degree this is hypothetical rather than based on this case, is autism or being on the spectrum a disability? I would say that having autism or being on the spectrum could be a disability if it limits a major life activity. But that's not the complete analysis. You also have to, for liability, establish that for an accommodation case, you'd have to establish that the company knew about the disability. Yeah, this is more hypothetical rather than on the facts of this case, because this was not raised as an argument. That's right, Your Honor. It was not raised. And so, with respect to the stress reactions, the argument fails. I'd like to also address sort of the timing issue of what disabilities the company knew about when, because plaintiff's argument tended to conflate when those things happened. So, Judge Fletcher, as you pointed out, the migraines the company had known about for many years, there was never a formal accommodation put in place. Plaintiff never submitted a doctor's note. She just sort of took time off or came in early or worked late to manage it. So, that was the only thing that the company had any remote awareness of until it put her on the performance recovery plan. At the moment that it did so, in February of 2018, that's when plaintiff submits a doctor's note saying that she had an anxiety attack and a stress-related condition. And she took two weeks off for that, and she came back with no medical restrictions. And so, throughout the time that this PRP process is ongoing, from February to June, there's no other doctor's notes submitted. There's no other requests for accommodations being made. And so, I think it's important to keep that timeline in mind when we're talking about disability animus and who knew what when. Then, with respect to this setting up to fail theory that plaintiff's counsel alluded to, again, the timing is important there because plaintiff was put on the platform project in late 2017. Ms. Patel made that decision long before she knew anything about the stress or the doctor's note or the medical leave. So, by definition, this wasn't some grand plan to set her up to fail because of some disability animus. She put her on the project because she needed the code cleaned up and plaintiff was a good engineer. And the fact that she didn't meet those deadlines and didn't meet the company's expectations doesn't mean that they were setting her up to fail for any disability-related reason. It just means she didn't perform the job up to the company's expectations, and it was entitled to terminate her for that. In addition, the fact is that the company bent over backwards to try and help her through this process. The PRP, there were weekly or almost weekly meetings. There was continuous feedback. The deadlines were extended several times, first, at plaintiff's request, second, after she went on leave, third, when she went on vacation, and fourth, when she submitted a letter to management. So, they really tried over a long period of time. Well, maybe PRP is basically our ways to fire somebody. Perhaps. I don't think that's what the record reflects in this case, though, Your Honor. I think there's a pretty extensive documentation of precisely clear expectations, clear deadlines that are supposed to be met and they're not being met. And you can just see it on the paper, submit this platform project plan by X date. She doesn't do it. They ask her again, they ask her again, it just doesn't happen. And on a project as important as that, as they were working on, I think they were well within their rights to do it. To expect her to meet those deadlines, and she didn't do so. And then with respect to this flex time issue and taking away flex time, there was never any formal flex time accommodation that was put in place. Plaintiff never asked for intermittent leave. There was nothing that the HR department designated as flex time. She took time off when she needed to, and many times it was for reasons having nothing to do with migraines. As she testified herself, sometimes she did it because she just preferred working from home, it was quieter there. Sometimes the internet connection at the office wasn't good. So this wasn't some sort of formal accommodation that was then specifically taken away from her once she advised them of a disability. And she testified unequivocally that any time she asked for time off, it was given to her. And I believe those are all of my formal remarks, unless the panel has other questions for me. Thank you, Counsel. Thank you very much. Mr. May, I'll give you a minute or so if you have rebuttal. Okay, thank you, Your Honor. Very quickly, Counsel said that we want you to ignore all that, all the counseling that led up to her termination. But what matters is what was the situation at the time she was terminated. The termination only has to be partially motivated by discriminatory animus in order to be actionable. So even if those are all legitimate criticisms of her performance, it doesn't matter. On predating the discovery of her disabilities, I think appellees get the date wrong. I think they think it's January 31st. It's actually January 8th of 2013, excuse me, 2018. The plaintiff was consistent in her deposition and in her declaration that she spoke to them on the 8th. She spoke to them again on the 31st, but that she first disclosed it on the 8th. And on the matter of the plaintiff not claiming discrimination at the time, there's no requirement that a discrimination plaintiff do that. You don't have to recognize discrimination at the time you're being discriminated against. You might not know you're being discriminated against at the time, so there's no significance at all to the fact that she didn't allege discrimination at the time. And finally, on the matter of the plan of setting her up to fail, and the flex time, for that matter, being initiated before they knew of her disabilities, I really don't see a functional distinction between putting somebody in a position where they're going to fail after learning about their disabilities and keeping them in one after you've learned about their disabilities. I just don't see a distinction. Same thing with the flex time. Having the flex time taken away when it had been there before is just yanking the rug out from under somebody. So I do think that is indicative. And if the panel has any questions, I'm happy to respond. Okay. Thank you very much, Counsel. Levinson v. Aeronautical Radio will be submitted.
judges: WARDLAW, FLETCHER, Korman